1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11  WHITNEY DUENEZ, individually        No.  CIV. S-11-1820 LKK/KJN
    and as successor-in-interest
12  for Decedent ERNESTO DUENEZ,
    JR.; D.D., a minor, by and
13  through his guardian ad           **ORDER**
    litem, WHITNEY DUENEZ;
14  ROSEMARY DUENEZ,
    individually; and ERNESTO
15  DUENEZ, SR., individually,

16              Plaintiffs,

17       v.

18  CITY OF MANTECA, a municipal
    corporation; DAVID BRICKER,
19  in his capacity as Chief of
    Police for the CITY OF
20  MANTECA; (FNU) AGUILAR,
    individually and in his
21  official capacity as a police
    officer for the CITY OF
22  MANTECA; and DOES 1-100,
    inclusive,
23
                Defendants.
24

25                        **I.   BACKGROUND**

26       On June 8, 2011, defendant John Moody, a Manteca police

27  officer, shot and killed Ernesto Duenez, Jr.  Complaint ¶¶ 1 & 9;

28  Answer at 3 lines 4-5 and 20-22.  The events leading to the

                                    1

1  shooting, the shooting itself, and subsequent events, were

2  captured on a "dash-cam" video taken from Officer Moody's car.

3  Complaint ¶ 1.[1]

4       This lawsuit is brought by decedent's widow, Whitney Duenez,

5  his son, D.D. (Whitney Duenez is D.D.'s guardian <u>ad litem</u>), and

6  his parents, Ernesto and Rosemary Duenez, against Moody, the City

7  of Manteca and David Bricker, the Chief of Police.

8       The Complaint contains eight (8) federal and state claims.

9  The federal claims allege violations of decedent's and

10 plaintiffs' constitutional rights under the Fourth and Fourteenth

11 Amendments to be free from governmental use of excessive force

12 resulting in death, denial of medical attention and denial of

13 rights to familial relationships.  The state claims allege

14 negligent and intentional infliction of emotional distress,

15 wrongful death and violation of Cal. Civ. Code § 52.1.

16      Both sides move for summary judgment, each asserting that

17 the video conclusively shows that Moody was, or was not,

18 justified in shooting and killing the decedent.  In addition,

19 plaintiffs move to seal certain documents, and to re-open

20 discovery so that they can depose defendants' counsel.

21      For the reasons set forth below, defendants' motion for

22 summary judgment and for partial summary judgment will be granted

23

24 [1] Defendants object to plaintiffs' submission of the dash-cam
   videos from Moody's car, asserting that it is "not
25 authenticated," and is "hearsay."  Defendants' Objection to
   Evidence in Opposition to Plaintiffs' Motion for Summary Judgment
26 ("Defendants' Objections") (ECF No. 89-3 at p.2 lines 3-6.  It is
   not necessary to resolve this puzzling objection, since the
27 defendants have also submitted the video, and it is not objected
   to by plaintiffs.

28

                                     2

1    in part and denied in part.  Plaintiffs' motions for summary

2    judgment, to seal documents and to re-open discovery will be

3    denied in their entireties.

### II.  UNDISPUTED FACTS

#### 1.    Initial report on decedent.

6        On June 8, 2011, Officer Armen Avakian (not a defendant),

7    responded to a report of suspicious activity on Ribier Court,

8    where decedent's wife, Whitney Duenez, lived, according to the

9    landlady.  Plaintiffs' Statement of Undisputed Facts ("PSUF")

10   (ECF No. 75-1) ¶ 1.[2]  According to the landlady, decedent was in

11   the apartment, and he and Whitney were not getting along at that

12   time.  Id.

13       Avakian ran a warrant check on decedent, which indicated

14   that he was "armed and dangerous," and that he was wanted on a

15   "parole hold" meaning, apparently, that his parole had been

16   revoked.  PSUF ¶ 3; DSUF ¶¶ 25-26.  Avakian spoke to decedent's

17   parole officer and learned that the "parole hold" resulted from

18   decedent having "'peed dirty,'" and his not being in contact with

19   his parole officer.  PSUF ¶ 4.  Avakian also learned that the

20   "armed and dangerous" label came (at least in part), from the

21   parole officer's having received information that decedent

22

23   [2] Unless otherwise noted, the facts cited in the PSUF are
     "Undisputed for purposes of this motion" by defendants.  See
24   Defendants' Opposition to Plaintiffs' Statement of Undisputed
     Facts ("Def. Opp. To PSUF")(ECF No. 89-2).  It appears that
25   defendants are permitted to limit their concessions in this way.
     See Fed. R. Civ. P. 56(e)(2) ("If a party … fails to properly
26   address another party's assertion of fact as required by
     Rule 56(c), the court may … consider the fact undisputed for
27   purposes of the motion").

28

3

1   carried a small firearm in his butt-cheeks.  PSUF ¶ 5.  Avakian

2   learned from Officer Ranch Johnson (not a defendant) that

3   decedent had reportedly been involved in a recent shooting.  PSUF

4   ¶ 6.  Finally, Avakian learned that Duenez could sometimes be

5   found at a residence on Flores Court.  PSUF ¶ 7.  Avakian passed

6   this information on to Moody and others on the incoming work

7   shift.  PSUF ¶ 8.

8       At some point, Officer Mark Rangel (not a defendant)

9   responded to a call from a civilian named Michael Henry that

10  decedent and Whitney had recently left a residence on Pillsbury

11  Road where they had been engaged in a shouting match.  PSUF ¶ 9.

12  Henry later advised the police that decedent had left the

13  Pillsbury Road residence, in the back of a blue pickup truck, and

14  that decedent had a "throwing knife" with him.  PSUF ¶ 10-11.[3]

15  Henry advised the police that decedent was in the truck with a

16  man (his uncle) and a woman, and that they had left in the truck

17  with decedent willingly.  PSUF ¶ 12.

18          **2.  Officer Moody.**

19      Defendant Moody has been a "sworn police officer" with the

20  Manteca Police Department since 2000.  Defendants' Separate

21  Statement of Undisputed Facts ("DSUF") (ECF No. 80-2) ¶ 2.[4]  Up

---

[3] Plaintiff asserts that decedent was "sitting in the back" of
the truck.  Defendants point out that the testimony plaintiff
cites to for this assertion states that decedent "was hiding in
the back" of the truck.  See May 13, 2013 Deposition of Officer
Mark Rangel ("Rangel Depo.") (ECF No. 76-3) at 10 (Exhibit A to
August 12, 2013 Nisenbaum Declaration, ECF No. 76).

[4] Unless otherwise noted, the facts cited in the DSUF are
"Undisputed" by plaintiffs.  See Plaintiffs' Objections to
Defendants' Separate Statement of Undisputed Facts ("Objections")
(ECF No. 92).

until the shooting at issue here, the police department had

received no complaints about Moody, concerning use of force,

provision of medical assistance, truthfulness or concealment of

misbehavior.  DSUF ¶¶ 3-4.  Moody has never been disciplined

based upon any claim of excessive force, providing medical care,

truthfulness or "concealment" of misbehavior.  DSUF ¶ 5.[5]  During

the entire time Moody was employed by MPD, he was involved in

only one other incident involving his shooting a firearm in the

line of duty.  DSUF ¶ 6.  The MPD examined that incident and

---

Plaintiffs failed to comply with the Local Rules of this court in
responding to the DSUF.  See E.D. Cal. R. 260(b).  The Objections
failed to "reproduce the itemized facts" in the DSUF (this is
normally done in chart form), to which plaintiffs were
responding.  In addition, the Objections failed, in two instances
(Nos. 32 & 33), to provide a "citation to the particular
portions" of the pleadings or evidence upon which the denial was
based.  Plaintiffs and their counsel are cautioned that the court
expects compliance with its local rules, and that failure to
comply could result in the imposition of sanctions.

[5] Defendants support this fact with testimony from defendant
Bricker: "Office MOODY … received no discipline concerning his
use of force while at the Department.  Nor did he receive …
discipline for any allegations that he was untruthful, or that he
'covered up' his use of force or for providing medical care other
than in the present action."  Declaration of David Bricker
("Bricker Decl.") (ECF No. 82-35) at 2.  Plaintiffs "dispute"
this fact, but offer no evidence to put it genuinely in dispute.
Instead, citing a "confidential" portion of Bricker's deposition
testimony, they argue that a witness to an earlier shooting (in
which Moody shot out the tire of a car), "criticized" Moody for
shooting at the car, and refer to two persons interviewed about
the shooting as "complaining" witnesses.  Objections ¶ 5.  Even
if there were a proper evidentiary basis for these arguments (and
there is not, as plaintiffs' assertions are based upon, at best,
hearsay within hearsay within hearsay: deposing counsel's
questions about a newspaper account of what these purported
witnesses had said to a reporter), they do not even attempt to
dispute that Moody was not "disciplined."

1  determined that Moody's actions were justified and proper.  Id.

2  ### 3.   Moody stakes out 245 Flores Court.

3  Defendant Moody waited near 245 Flores Court for decedent to

4  arrive.  PSUF ¶ 14.  When the pickup truck arrived, Moody

5  "radioed dispatch," and immediately pursued the truck.  PSUF

6  ¶ 15.  When the truck pulled into the driveway, Moody pulled his

7  car up behind it, blocking the truck.  PSUF ¶ 17; Moody saw that

8  Duenez was in the back seat of the pickup truck.  Id.

9  ### 4.   The confrontation begins.

10  Moody exited his car and began issuing commands to decedent.

11  PSUF ¶ 18; Bricker Decl. Exh. A ("Exh. A") (ECF No. 80-35) (video

12  of the incident).  Upon exiting his car, Moody ordered decedent

13  not to move.  Id.  He ordered decedent to show his hands or put

14  his hands up.  Id.  While this was happening, Moody initially

15  drew his weapon, then holstered it, then drew it again.  PSUF

16  ¶ 18; Exh. A.  Meanwhile, decedent was exiting the pickup truck,

17  or attempting to exit it, on the passenger side.  Id. ¶¶ 18 & 19;

18  Exh. A.  As he was exiting the truck, decedent appears to have

19  briefly had an object in his right hand.  PSUF ¶ 20; Exh. A.[6]

20  ### 5.   Moody shoots decedent to death.

21  Moody ordered decedent to "drop the knife."  PSUF ¶ 21.

22  Immediately upon issuing this order, Moody started shooting

23

24  _____

25  [6] Plaintiffs assert that tweezers later found on the scene are consistent with the object seen in the video.  PSUF ¶ 20.

26  Defendants say that decedent had a knife in his hand, citing Moody's deposition testimony that decedent had "a large knife,

27  chrome or silver blade" in his right hand.  See Moody Depo. at 26.

28

decedent.[7]   PSUF ¶ 21; Exh A.   Moody fired thirteen (13) shots at

decedent, killing him.   PSUF ¶ 23; Exh. A; Answer at p.2, lines

20-22.[8]   The final shots were fired after decedent had fallen to

the ground.   PSUF ¶ 22; Exh. A.[9]   After he stopped shooting,

Moody radioed in that shots had been fired, causing the police

dispatcher to immediately summon emergency medical help to the

scene.   DSUF ¶ 15; Declaration of John Moody ("Moody Decl.") (ECF

No. 80-36) at 5.   Moody did not render any medical assistance to

decedent as he lay dying, nor did he do anything after the

shooting to medically injure the decedent.[10]   DSUF ¶ 22-23; Moody

Decl. at 5.

### 6.   Whitney Duenez arrives.

Upon the firing of the final shots, Whitney Duenez arrived

on the scene.   PSUF ¶ 25.[11]   The police on the scene ordered

---

[7] Plaintiffs say Moody began shooting "almost simultaneously"
with this command.   PSUF ¶ 21.   Defendants say Moody began
shooting after this command, citing the video.   Defendants'
Opposition to PSUF ¶ 21.

[8] Plaintiffs say Moody shot decedent thirteen times.   PSUF ¶ 23.
However, the evidence plaintiffs cite only indicates that Moody
shot at decedent thirteen times, but does not indicate that
decedent was hit thirteen times.   See Moody Depo. at 37.

[9] Plaintiffs say decedent was "already shot and on the ground."
PSUF ¶ 22.   Defendants say decedent was "curling up off the
ground towards the open doorway of the pickup truck," citing the
video.   Defendants' Opposition to PSUF ¶ 22.

[10] Plaintiffs say Moody had a legal obligation to render aid.
Defendants say he had no such legal obligation, and in any event,
there was nothing Moody could have done.

[11] Plaintiffs say Whitney ran screaming to the scene
"[s]imultaneous with the last shots."   PSUF ¶ 25.   Defendants say
the video indicates she arrived "several seconds after the last
shot was fired," and was not screaming.   Def. Opp. to PSUF ¶ 25.

Whitney to "move back."  PSUF ¶ 27.  Officer Rangel (not a
defendant) pulled Whitney away from the scene, handcuffed her,
and placed her in a patrol car.  PSUF ¶ 29.[12]

### 7.  Moody handcuffs and searches decedent.

After the shooting, Moody tried to pull the decedent away
from the truck, but was unable to do so because, as he
discovered, decedent's foot was entangled in the seat belt.  PSUF
¶ 30.  An officer (either Moody or another officer), then cut the
seatbelt to release decedent's foot, and Moody "reasonably and
properly" pulled decedent away from the truck "for proper safety
reasons."  DSUF ¶ 16;[13] PSUF ¶¶ 31 & 32.  Moody then "flipped" the
decedent over and "properly handcuffed" the decedent "for proper
safety reasons."  DSUF ¶ 17;[14] PSUF ¶ 33.  Decedent was still
alive when he was pulled away from the truck, flipped over and
handcuffed.  PSUF ¶ 33.  Moody then searched the decedent for
weapons, including a search of decedent's buttocks area.  PSUF
¶ 34.[15]  The search of decedent's body and clothing did not

---

[12] Both sides agree that Rangel wanted to avoid contaminating the
scene.  Defendants assert that he also pulled her away because
she was disobeying his orders.

[13] Plaintiff says "undisputed" to defendants' "reasonably and
properly" characterizations and "safety reasons" explanation.

[14] Plaintiff again says "undisputed" to defendants' "reasonably
and properly" characterizations and "safety reasons" explanation.

[15] Plaintiffs characterize this as a strip search because, they
assert, Moody pulled decedent's pants or underwear down.
Defendants say it was not a strip search because Moody only
lifted decedent's underwear briefly and glanced at the buttocks
area.  The court notes the following language from the Supreme
Court, referring to the search of a person who, unlike the
mortally wounded decedent, is still conscious and able to follow
directions:

produce a knife or a gun, or any other weapon.  PSUF ¶ 35.

     From the time of the search until medical help arrived, the scene was sufficiently secure that medical assistance could have been given to the decedent.  PSUF ¶ 38.  During that time, neither Moody nor any other police officer at the scene provided any medical assistance to the decedent as he lay dying.  PSUF ¶ 38.  However, Moody did eventually request that someone retrieve a trauma kit from his patrol car, and he cut off decedent's shirt.  PSUF ¶ 37.  However, paramedics arrived and Moody did not take any further action regarding the decedent.

---

> [S]ome cases of this Court refer to a "strip search."  The term is imprecise.  It may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position.

<u>Florence v. Board of Chosen Freeholders of County of Burlington</u>, 566 U.S. ___, 132 S. Ct. 1510, 1515 (2012).  The court also notes this definition of "strip search" contained in the California Penal Code:

> As used in this section, "strip search" means a search which requires a person to remove or arrange some or all of his or her clothing so as to permit a visual inspection of the underclothing, breasts, buttocks, or genitalia of such person.

Cal. Penal Code § 4030(c).

9

PSUF ¶ 37; Exh. A.

### 8.   The on-scene investigation.

Officer Ranch Johnson (not a defendant), looked for evidence at the scene of the shooting.  PSUF ¶ 39.  He found a "black clip-on knife" holder attached to decedent's belt and a knife in the bed of the truck on the "driver's side tailgate."  Id.  He also found black tweezers on the ground near the passenger's side of the truck.  Id.  The tweezers did not belong to any of the officers at the scene.  PSUF ¶ 41.  In addition, Johnson found a glass drug pipe on the lawn and shell casings scattered about. Id.

### 9.   Defendant David Bricker, Chief of Police.

Defendant Bricker was the Chief of Police at the time of the shooting; he is now retired.  PSUF ¶ 42; DSUF ¶ 1.  Bricker went to the scene and transported Moody back to the police station. PSUF ¶ 43.  Bricker watched the dash cam video of the shooting the next morning.  PSUF ¶ 45.  Before the DA's investigation was completed, but after getting a preliminary view from the DA investigator, Bricker formed a "preliminary opinion" that the shooting was justified, and was within police department policy. He emailed his view to all police department staff.  PSUF ¶ 44. Bricker also publicly announced to the press, before the DA's investigation was completed, that the shooting was justified, and that the police department stood behind Moody.  PSUF ¶¶ 47-48; DSUF ¶ 12-13.

### 10.   The DA's investigation.

The San Joaquin County District Attorney's Office  (not a defendant) conducted an investigation into the shooting.  Accord,

1   PSUF ¶ 48.  The investigation was properly conducted under a

2   protocol that ensured that Chief Bricker would not be involved.

3   DSUF ¶ 9 & 10.  This investigation concluded that the shooting

4   was justified, and the City was so notified.  DSUF ¶ 28.  The

5   police department then conducted a "shooting review panel," and

6   determined that Moody "acted properly during this incident."

7   DSUF ¶ 30.

8        Nick Obligacion (not a defendant) became Chief of Police

9   while the investigation was still on-going.  He also concluded

10  that the shooting was justified and within police department

11  policies.  PSUF ¶¶ 50 & 51.

12       **11.  Officer Moody – training and qualifications.**

13       The State of California operates the Commission on Peace

14  Officer Standards and Training ("POST"), which specifies the

15  training requirement for peace officers, including Moody,

16  throughout the state.  Bricker Decl. at 2.  In order for an

17  officer to go on duty as a peace officer, that officer must meet

18  POST required firearm qualifications or requalifications for his

19  service weapons.  Id., at 3.  Under the City's testing methods, n

20  officer is required to achieve a passing score on one of up to

21  three "attempts" in order to pass the requalification.  Id.

22  Receiving a non-passing score on at "attempt" is not a failure of

23  the requalification attempt, however flunking all three attempts

24  "constitutes a failure of the requalification exam."  Id.

25       According to an apparently official document discussed

26  during Bricker's "confidential" deposition, Moody failed a

27  firearm requalification on or about May 12, 2008.  Confidential

28  Portion of Bricker Depo. at 66.  The deposition discussion is not

1  entirely clear about what happened, but from the language of the
2  document – "Test 1, fail.  Remedial, pass." – the court infers
3  that Moody flunked all three attempts, and later passed in a
4  remedial exam.  On December 7, 2010, Moody again failed the
5  firearms exam by flunking all three attempts.  Confidential
6  Portion of Bricker Depo. at 73.  It appears that once again Moody
7  eventually passed the requalification.  See id.  On February 9,
8  2011 Moody again failed the firearm requalification exam by
9  flunking all three attempts, "during a nighttime shooting
10  scenario."  Bricker Decl. at 3-4.[16]  However, Moody was able to
11  pass the exam on his next attempt the next day, after an apparent
12  defect in the weapon was corrected.  Id.

       **12.  Policy.**

14       Police department policy is that a police officer must
15  qualify and then periodically re-qualify on his firearm in order
16  to carry that firearm on duty.  See Confidential Bricker Depo.
17  at 78.  If an officer failed a requalification exam (that is,
18  flunked all three attempts), and then flunked the remedial exam
19  (that is, again flunked all three attempts), police department
20  policy would be to notify Bricker, who would then take action to
21  take the officer's gun away from him.  See Confidential Bricker
22  Depo. at 64-65.

23       Short of being unable to pass on the remedial exam, if an
24  officer has "a continuing pattern of failing the first time and

---

[16] Bricker declares that Moody "only failed one firearms skills
test," which occurred on February 9, 2011.  Bricker Decl. at 3.
However, he offers no explanation for his prior testimony
discussing Moody's apparent failures on or about May 12, 2008,
and on December 7, 2010.

1  passing on the remedials," then policy is to "reassign them to

2  additional firearms training."  Confidential Bricker Depo at 68.

3                          **III. STANDARDS**

4       **A.   Summary Judgment.**

5       Summary judgment is appropriate "if the movant shows that

6  there is no genuine dispute as to any material fact and the

7  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

8  P. 56(a); <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009) (it is the

9  movant's burden "to demonstrate that there is 'no genuine issue

10 as to any material fact' and that the movant is 'entitled to

11 judgment as a matter of law'"); <u>Walls v. Central Contra Costa</u>

12 <u>Transit Authority</u>, 653 F.3d 963, 966 (9th Cir. 2011) (per curiam)

13 (same).

14      Consequently, "[s]ummary judgment must be denied" if the

15 court "determines that a 'genuine dispute as to [a] material

16 fact' precludes immediate entry of judgment as a matter of law."

17 <u>Ortiz v. Jordan</u>, 562 U.S. ___, 131 S. Ct. 884, 891 (2011),

18 quoting Fed. R. Civ. P. 56(a); <u>Comite de Jornaleros de Redondo</u>

19 <u>Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011)

20 (en banc) (same), <u>cert. denied</u>, 132 S. Ct. 1566 (2012).

21      Under summary judgment practice, the moving party bears the

22 initial responsibility of informing the district court of the

23 basis for its motion, and "citing to particular parts of the

24 materials in the record," Fed. R. Civ. P. 56(c)(1)(A), that show

25 "that a fact cannot be ... disputed."  Fed. R. Civ. P. 56(c)(1);

26 <u>Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re</u>

27 <u>Oracle Corp. Securities Litigation)</u>, 627 F.3d 376, 387 (9th Cir.

28 2010) ("The moving party initially bears the burden of proving

1   the absence of a genuine issue of material fact") (citing Celotex

2   v. Catrett, 477 U.S. 317, 323 (1986)).

3       A wrinkle arises when the non-moving party will bear the

4   burden of proof at trial. In that case, "the moving party need

5   only prove that there is an absence of evidence to support the

6   non-moving party's case." Oracle Corp., 627 F.3d at 387.

7       If the moving party meets its initial responsibility, the

8   burden then shifts to the non-moving party to establish the

9   existence of a genuine issue of material fact.  Matsushita Elec.

10  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986);

11  Oracle Corp., 627 F.3d at 387 (where the moving party meets its

12  burden, "the burden then shifts to the non-moving party to

13  designate specific facts demonstrating the existence of genuine

14  issues for trial").  In doing so, the non-moving party may not

15  rely upon the denials of its pleadings, but must tender evidence

16  of specific facts in the form of affidavits and/or other

17  admissible materials in support of its contention that the

18  dispute exists.  Fed. R. Civ. P. 56(c)(1)(A).

19      "In evaluating the evidence to determine whether there is a

20  genuine issue of fact," the court draws "all reasonable

21  inferences supported by the evidence in favor of the non-moving

22  party." Walls, 653 F.3d at 966.  Because the court only

23  considers inferences "supported by the evidence," it is the non-

24  moving party's obligation to produce a factual predicate as a

25  basis for such inferences.  See Richards v. Nielsen Freight

26  Lines, 810 F.2d 898, 902 (9th Cir. 1987).  The opposing party

27  "must do more than simply show that there is some metaphysical

28  doubt as to the material facts ....  Where the record taken as a

1   whole could not lead a rational trier of fact to find for the

2   nonmoving party, there is no 'genuine issue for trial.'"

3   Matsushita, 475 U.S. at 586-87 (citations omitted).

### B.   Summary Judgment in the Video Age.

> At the summary judgment stage, facts must be
> viewed in the light most favorable to the
> nonmoving party only if there is a "genuine"
> dispute as to those facts. Fed. Rule Civ.
> Proc. 56(c). … When opposing parties tell
> two different stories, one of which is
> blatantly contradicted by the record, so that
> no reasonable jury could believe it, a court
> should not adopt that version of the facts
> for purposes of ruling on a motion for
> summary judgment.

> That was the case here with regard to the
> factual issue whether respondent was driving
> in such fashion as to endanger human life.
> Respondent's version of events is so utterly
> discredited by the record that no reasonable
> jury could have believed him.   The Court of
> Appeals should not have relied on such
> visible fiction; it should have viewed the
> facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. 372, 380-381 (2007) (granting

defendant's motion for summary judgment, and holding that

defendant's action in forcing the plaintiff – a fleeing suspect –

off the road, rendering him a quadriplegic, was reasonable in

light of the videotape showing the danger the suspect posed to

the public, because no reasonable jury could have found that

defendant's actions were unreasonable).

### IV.   ANALYSIS – STANDING

    All defendants move for summary judgment against all

plaintiffs on all claims.   In the alternative, they seek partial

summary judgment.

    In the First Cause of Action ("Claim 1"), Whitney Duenez and

D.D. assert a claim for "Wrongful Death 42 U.S.C. Section 1983."[17]
Plaintiffs have never been clear about whether their first claim
is a state claim for "wrongful death," or a federal claim under
42 U.S.C. § 1983.   However, the court has previously interpreted
it to be a federal claim under Section 1983, in which plaintiffs
allege that decedent's death was wrongful because it violated
decedent's rights under the Fourth and Fourteenth Amendments to
the U.S. Constitution.   See ECF No. 35 at 22-23.   Moreover,
having amended their original complaint, plaintiffs now
specifically assert a state claim for wrongful death in their
Seventh Cause of Action ("Claim 7") ("Negligence – Wrongful
Death").   Accordingly, the court reconfirms that Claim 1 contains
federal claims under 42 U.S.C. § 1983 only, and that it does not
assert any state claims.   In addition, the court construes Claim
1 as asserting survival claims, as they involve rights that are
personal to the decedent.[18]

     Defendants move to dismiss Claim 1 because (1) D.D., who is

---

[17] Defendants previously moved to dismiss this claim, asserting
that there is no federal claim for "wrongful death."   ECF No. 27
at 10.   The motion was denied because the claim was a federal
claim alleging excessive force and denial of the right to medical
care under the Fourth and Fourteenth Amendments and Section 1983.
ECF No. 35.

[18] The original complaint asserted that all plaintiffs and
decedent were deprived of their constitutional rights to be free
from unreasonable searches and seizures by the shooting and
killing of decedent.   See ECF No. 1 ¶ 32.   The court granted
defendants' motion to dismiss this claim in part, but permitted
the claim to proceed as brought by decedent's widow, as she was
the only person alleged to be his successor-in-interest.   ECF
No. 21 at 14-15 ("only Whitney Duenez may assert a claim for
violation of the decedent's Fourth Amendment rights").   The court
dismissed the claim as to all other plaintiffs.   Id.

1   not alleged to be decedent's personal representative or successor

2   in interest has no standing to bring a survivor claim, and

3   (2) the claim duplicates the survival claim brought by Whitney

4   Duenez in the fourth claim.

5       **A.   D.D.**

6       Claim 1 is a federal Section 1983 claim arising from two

7   alleged constitutional violations.

8               "In § 1983 actions, ... the survivors of an
            individual killed as a result of an officer's
9           excessive use of force may assert a Fourth
            Amendment claim on that individual's behalf
10          if the relevant state's law authorizes a
            survival action.  The party seeking to bring
11          a survival action bears the burden of
            demonstrating that a particular state's law
12          authorizes a survival action and that the
            plaintiff meets that state's requirements for
13          bringing a survival action." <u>Moreland v. Las
            Vegas Metro. Police Dep't</u>, 159 F.3d 365, 369
14          (9th Cir. 1998) (internal citation omitted).

15  <u>Hayes v. County of San Diego</u>, ___ F.3d ___, 2013 WL 6224281 at

16  *2, 2013 U.S. App. LEXIS 23939 (9th Cir. 2013).

17      In California, with exceptions not asserted to apply here,

18  "a cause of action for or against a person is not lost by reason

19  of the person's death, but survives subject to the applicable

20  limitations period."  Cal. Code Civ. P. § 377.20.  Further, "[a]

21  cause of action that survives the death of the person entitled to

22  commence an action or proceeding passes to the decedent's

23  successor in interest … and an action may be commenced by the

24  decedent's personal representative or, if none, by the decedent's

25  successor in interest."  Cal. Code Civ. P. § 377.30.  The action

26  brought by the successor in interest to a decedent pursuant to

27  Section 377.30 is a "survival" claim.  <u>Adams v. Superior Court</u>,

28  196 Cal. App. 4th 71, 78-79 (2nd Dist. 2011) ("[s]urvival causes

1   of action are governed by section 377.30).  Unlike a wrongful

2   death claim, "'the survival statutes do not create a cause of

3   action but merely prevent the abatement of the decedent's cause

4   of action and provide for its enforcement by the decedent's

5   personal representative or successor in interest.'"  Id. (quoting

6   San Diego Gas & Electric Co. v. Superior Court, 146 Cal. App. 4th

7   1545, 1553 (4th Dist. 2007)).

8        Therefore, D.D. has standing to assert this claim as a

9   survival claim if he is a successor in interest to the decedent.

10  The court dismissed D.D.'s claim in the original complaint, with

11  leave to amend, because there was no allegation that he was a

12  successor in interest, and because none of the statutory

13  requirements for making D.D. a successor in interest were

14  apparent.  ECF No. 21 at 14 & n.3; see Cal. Civ. Proc. § 377.32.

15  Plaintiffs have now submitted a declaration from Whitney Duenez

16  establishing that she and D.D. have fulfilled the legal

17  requirements for making them both the successors in interest to

18  the decedent.  ECF No. 66.[19]  Inexplicably, however, the amended

19  Complaint still does not allege that D.D. is a successor in

20  interest.  Plaintiffs have nevertheless asserted that they are

21  willing to amend the complaint to allege that D.D. is suing as a

22  co-successor in interest.  Accordingly, notwithstanding the

23  plaintiffs' strange way of addressing this issue, the court will

24  construe Claim 1 by D.D. to be a survival action.  D.D. has

25  standing to bring this survival action, as it is undisputed at

26  this point that he is a successor in interest to his father's

27  
_____

28  [19] Defendants have not challenged that declaration.

18

1  estate.

2      **B.    Whitney Duenez.**

3          Defendants seek summary judgment against Whitney Duenez on

4  Claim 1, arguing that the claim duplicates the Fourth Cause of

5  Action ("Claim 4"), which is expressly labeled as a Section 1983

6  survival claim.  Plaintiffs argue that the two claims are

7  "distinct," but their argument is unintelligible on this point.

8  Among other problems, plaintiffs use the language of "wrongful

9  death" and "survival" claims interchangeably.  See ECF No. 97 at

10 15 (referring to the first claim as a "Wrongful Death" claim for

11 damages decedent could have sued for "had he survived" the

12 incident).  However, these terms refer to entirely different

13 claims.  See Hayes, 2013 WL 6224281 at *3 (wrongful death claim

14 is "based on personal injuries resulting from the death of

15 another," whereas "survival actions … are based on injuries

16 incurred by the decedent").

17          Indeed, instead of distinguishing the two claims,

18 plaintiffs' arguments simply confirm that the two claims are both

19 survival claims, even though the first claim does not contain the

20 language of a survival claim.  According to plaintiffs, the first

21 claim is for "Fourth and Fourteenth Amendment violations the

22 Decedent Duenez suffered and damages for which he would have been

23 entitled to recover had he survived."  ECF No. 97 at 15.  That is

24 a "survival claim" under California law.  The fourth claim is for

25 "Fourth and Fourteenth Amendment violations that Decedent Duenez

26 suffered for damages that he is entitled to which survive his

27 death."  That is also a "survival claim" under California law.

28 Both survival claims are brought under 42 U.S.C. § 1983 against

Moody, for violations of the Fourth and Fourteenth Amendments to the U.S. Constitution.  Both are brought by the successors in interest to the decedent.

What is distinct about the claims is that Whitney Duenez's Claim 4 contains a survival Due Process claim for deprivation of familial relationships, which is missing from Claim 1.[20]  Whitney Duenez's survival Fourth Amendment claim of Claim 1 does duplicate her survival Fourth Amendment claim of Claim 4, however, and so that claim will be dismissed from Claim 1.

## V.   QUALIFIED IMMUNITY

### A. Claims 1 and 4 – Fourth Amendment Claims Based Upon Moody's Shooting of Decedent.

The Complaint's first and fourth claims assert Fourth Amendment survival claims against Moody arising from Moody's actions in shooting and killing the decedent.  Moody argues that

---

[20] However, as this court has previously held,

> [a]llowing a decedent, through his estate, to sue for his own lost relationships with family members based on his death, and not the death of another family member during his life, violates common sense. Cf. Crumpton v. Gates, 947 F.2d 1418, 1422 (9th Cir. 1991) ("Assume parent and child were run over and killed by a driver who was at fault. While both estates could sue for wrongful death, neither could make out a claim for loss of familial companionship, for neither would appreciate the loss of the other.") (dicta).

ECF No. 35 at 23-24.  Accordingly, the court will sua sponte dismiss the portion of the Fourth Cause of Action which asserts a survival Section 1983 claim for decedent's loss of familial relationships.

he is entitled to qualified immunity on those claims because the video shows beyond reasonable dispute that "a reasonable officer in his position, facing a knife-wielding suspect, could have believed that the use of deadly force was reasonably necessary." ECF No. 80-1 at 35-36.  The court notes that plaintiffs assert that they are entitled to summary judgment on these claims because the video of the encounter shows beyond reasonable dispute that Moody used excessive deadly force against the un-armed, non-dangerous decedent, an assertion addressed below.

Plaintiffs are correct that a reasonable jury could view the video as they describe it.  Moody is correct that a reasonable jury could view the video as he describes it.  Accordingly, summary judgment must be denied to both, and the matter must be submitted to the jury.

### 1.  Fourth Amendment – excessive force.

The Fourth Amendment forbids a police officer from seizing "an unarmed, nondangerous suspect by shooting him dead." Tennessee v. Garner, 471 U.S. 1, 11 (1985).[21]  Viewing the evidence, especially the video, in the light most favorable to plaintiffs, a reasonable jury could conclude that Moody seized the decedent, a visibly unarmed, non-dangerous civilian, by shooting him dead.  See Exh. A.  At a minimum, a reasonable jury could find that Moody's continued shooting of decedent, even

---

[21] "Whenever an officer restrains the freedom of a person to walk away, he has seized that person.  While it is not always clear just when minimal police interference becomes a seizure, there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  Garner, 471 U.S. at 7 (citations omitted).

1  after he had crumpled to the ground, was an excessive use of

2  force.

3           **2.   Qualified immunity.**

4           "The doctrine of qualified immunity protects
           government officials 'from liability for
5           civil damages insofar as their conduct does
           not violate clearly established statutory or
6           constitutional rights of which a reasonable
           person would have known.'" <u>Pearson v.</u>
7           <u>Callahan</u>, 555 U.S. 223, 231 (2009) (<u>quoting</u>
           <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818
8           (1982)).   Qualified immunity "gives
           government officials breathing room to make
9           reasonable but mistaken judgments," and
           "protects 'all but the plainly incompetent or
10          those who knowingly violate the law.'"
           <u>Ashcroft v. al-Kidd</u>, 563 U.S. ----, ----, 131
11          S. Ct. 2074, 2085 (2011) (<u>quoting</u> <u>Malley v.</u>
           <u>Briggs</u>, 475 U.S. 335, 341 (1986)). "[W]hether
12          an official protected by qualified immunity
           may be held personally liable for an
13          allegedly unlawful official action generally
           turns on the 'objective legal reasonableness'
14          of the action, assessed in light of the legal
           rules that were 'clearly established' at the
15          time it was taken." <u>Anderson v. Creighton</u>,
           483 U.S. 635, 639 (1987) (citation omitted).
16

17  <u>Messerschmidt v. Millender</u>, 565 U.S. ___, 132 S. Ct. 1235, 1244-

18  45 (2012).

19       Because Moody is sued for conduct he undertook while in the

20  line of duty, this court's inquiry into his claim of qualified

21  immunity must balance two competing interests, namely, "'the need

22  to shield officials from harassment, distraction, and liability

23  when they perform their duties reasonably,'" but also, "'the need

24  to hold public officials accountable when they exercise power

25  irresponsibly.'" <u>Johnson v. Bay Area Rapid Transit Dist.</u>, 724

26  F.3d 1159, 1168 (9th Cir. 2013) (<u>quoting</u> <u>Pearson</u>, 555 U.S. at

27  231).

28

                                22

1     This court applies a two-part test to determine whether this

2 case is about the former, a reasonable exercise of power, or the

3 latter, an irresponsible exercise of power.  Keeping in mind that

4 this is a summary judgment motion, the court must decide in the

5 first step whether, viewing the facts in the light most favorable

6 to plaintiffs, those facts demonstrate that Moody's conduct

7 "violated one or more of the plaintiffs' constitutional rights."

8 Johnson, 724 F.3d at 1168 (citing Pearson, 555 U.S. at 236).[22]  In

9 the second step, the court must decide "whether the right at

10 issue was 'clearly established' at the time of defendant's

11 alleged misconduct."  Pearson, 555 U.S. at 232.  Put another way,

12 this court, understanding that a "reasonable officer avoids

13 committing acts that have been clearly established as

14 unconstitutional," asks whether "the reasonable officer also

15 would have committed the act that the plaintiffs contend is

16 unconstitutional."  Johnson, 724 F.3d at 1168.  Moody is entitled

17 to qualified immunity unless his conduct "violated a clearly

18 established constitutional right."  Pearson, 555 U.S. at 232.

19     Accordingly, even though a reasonable jury could find that

20 Moody violated decedent's Fourth Amendment right to be free from

21 the official use of deadly force, as discussed above, Moody can

22 still claim qualified immunity if the right was not "clearly

23 established" at the time of the shooting.

24 _____

25 [22] Although the Supreme Court previously mandated that this be the
"first" step, Saucier v. Katz, 533 U.S. 194 (2001), it has since
26 retreated from that view, leaving it up to the district court to
decide which step to consider first.  Pearson, 555 U.S. at 236
27 ("we now hold that the Saucier protocol should not be regarded as
mandatory in all cases," although "we continue to recognize that
28 it is often beneficial"); Johnson, 724 F.3d at 1168.

1    The court finds that it was clearly established at the time

2    of the shooting that it was a Fourth Amendment violation to seize

3    an unarmed, non-dangerous civilian by shooting him dead.  See

4    Garner, 471 U.S. at 11; Torres v. City of Madera, 648 F.3d 1119,

5    1128 (9th Cir. 2011) ("few things in our case law are as clearly

6    established as the principle that an officer may not "seize an

7    unarmed, nondangerous suspect by shooting him dead" in the

8    absence of "probable cause to believe that the [fleeing] suspect

9    poses a threat of serious physical harm, either to the officer or

10   to others"), cert. denied, 565 U.S. ___, 132 S. Ct. 1032 (2012).

11       Moody's 15-line qualified immunity argument fairly begs not

12   to be taken seriously.  It simply asserts facts that might

13   exonerate Moody, without reference to any actual evidence adduced

14   in the case.  Moody argues, specifically, that any reasonable

15   officer would have shot decedent because decedent was a "knife-

16   wielding" suspect, who was "waving a knife er[r]atically."  ECF

17   No. 35-36.  Moody does not identify any place in his Separate

18   Statement of Undisputed Facts (ECF No. 80-2) that even asserts

19   that the decedent was in possession of a knife when he exited the

20   truck, or was "wielding" a knife at that time, much less that

21   decedent was waving it "erratically," when Moody shot him.  To

22   the contrary, the video of the shooting shows that there may be

23   something briefly in decedent's hand, but it is not clear beyond

24   reasonable dispute that it is a knife, or a weapon of any kind.

25   See Exh. A.  The video certainly does not show the decedent

26   waving a knife erratically.  To the contrary, the video shows

27   conclusively that the decedent did not wave any knife (or

28   whatever it was that briefly appeared in his hand), erratically

1   or in a threatening manner.[23]   Accordingly, a reasonable jury

2   could find that Moody violated the decedent's clearly established

3   Fourth Amendment rights by seizing an unarmed, non-dangerous

4   civilian by shooting him dead.

5        The court accordingly will deny Moody's motion for summary

6   judgment on the survival claims of Claims 1 and 4, asserting

7   Fourth Amendment violations arising from shooting the decedent.

8        **B.   Claim 1 – Qualified Immunity for Not Personally**
          **Providing Medical Care.**

9

10       The Complaint alleges that after the shooting, and after the

11  scene had been secured, neither Moody nor any other police

12  officer present personally gave the decedent any medical care.

13  Plaintiffs assert that this violated decedent's Fourth Amendment

14  and Due Process rights to medical care.

15       However, it is undisputed that after the shooting,

16  "emergency medical care was immediately summoned."   DSUF ¶ 19.[24]

17  _____

18  [23] In any event, the mere possession of a knife by the decedent,
    without more, is not enough to conclusively render the use of
    deadly force "reasonable."   Rather, the "most important" factor

19  in determining the reasonableness of the use of deadly force is
    whether the decedent posed an "immediate threat" to Moody's

20  safety, or the safety of others.   Glenn v. Washington County, 673

21  F.3d 864, 872 (9th Cir. 2011) (in concluding that the decedent
    (Lukus) was a danger, "the district court relied primarily on

22  Lukus' possession of a knife."   This was error, because "although
    there is no question this is an important consideration, it too

23  is not dispositive").

24  [24] Plaintiffs say this is "Disputed," citing the deposition
    testimony of John J. Ryan.   Plaintiff's Objections to DSUF (ECF

25  No. 92) ¶ 19.   However, Ryan's testimony confirms that medical
    aid was summoned immediately.   Ryan Depo. (ECF No. 98-4) at 22.

26  Ryan takes issue with the police failure to personally render aid
    to the decedent.   Accordingly, what is disputed in the full

27  statement (DSUF ¶ 19), is whether the officers on the scene

28  "properly" did nothing other than wait for medical assistance to

1    Defendants argue that immediately calling for medical assistance

2    is all the constitution requires after they have shot someone.

3    Plaintiffs argue that Moody had a constitutional duty to

4    personally render assistance to decedent after shooting him.

5        Moody is entitled to qualified immunity on this claim.  In

6    Maddox v. City of Los Angeles, 792 F.2d 1408, 1415 (9th

7    Cir. 1986), the police officers mortally wounded a suspect by

8    applying a "choke hold" in the process of arresting him.  After

9    subduing the suspect, the police drove him to the hospital.

10   After arriving at the hospital, the officers "had difficulty

11   finding a pulse."  Although the officers were trained in CPR,

12   they did not use it to save the suspect.  Instead, they took him

13   to the jail ward on the thirteenth floor of the hospital.

14   Despite the medical staff's subsequent use of CPR, the suspect

15   was pronounced dead later that morning.  The Ninth Circuit was

16   clear that taking the mortally wounded suspect to the hospital

17   and up to the jail ward was all the constitution required:

>           The due process clause requires responsible
>           governments and their agents to secure
>           medical care for persons who have been
>           injured while in police custody.  We have
>           found no authority suggesting that the due
>           process clause establishes an affirmative
>           duty on the part of police officers to render
>           CPR in any and all circumstances.  Due
>           process requires that police officers seek
>           the necessary medical attention for a
>           detainee when he or she has been injured
>           while being apprehended by either promptly
>           summoning the necessary medical help or by
>           taking the injured detainee to a hospital.

Maddox, 792 F.2d at 1415 (emphasis added); accord, City of Revere

---

arrive.

26

1   v. Massachusetts General Hosp., 463 U.S. 239, 244-245 (1983)

2   (although "[t]he Due Process Clause … does require the

3   responsible government or governmental agency to provide medical

4   care to persons … who have been injured while being apprehended

5   by the police," the government "fulfilled its constitutional

6   obligation by seeing that [the suspect] was taken promptly to a

7   hospital that provided the treatment necessary for his injury");

8   accord Tatum v. City and County of San Francisco, 441 F.3d 1090,

9   1099 (9th Cir. 2006) (in a case where the police did not cause

10  the injury, the Ninth Circuit held "that a police officer who

11  promptly summons the necessary medical assistance has acted

12  reasonably for purposes of the Fourth Amendment, even if the

13  officer did not administer CPR").

14      Plaintiffs argue that the constitution requires the officers

15  to personally administer medical care to a person whom they

16  injure.  However, plaintiffs offer no contrary interpretation of

17  the above cases, nor do they identify even a single case that

18  holds that personal medical attention is required by the

19  constitution.

20      Because the undisputed facts show that Moody did not violate

21  the decedent's right to medical care, the court will grant

22  Moody's motion for summary judgment, on qualified immunity

23  grounds, on Claim 1's assertion of a Due Process violation

24  arising from the alleged failure to provide medical assistance.

25      **C.   Qualified Immunity for Search of Decedent.**

26      Moody seeks qualified immunity for the search of decedent's

27  body after the shooting.  ECF No. 80-1 at 15-19.  The Complaint

28  alleges no claim predicated upon that search.  However, both

1  parties treat the search as if it is alleged to be the predicate

2  for a Fourth Amendment claim, so the court will consider the

3  parties' arguments.

4      Plaintiffs assert that Moody conducted a "public strip

5  search" of the decedent after the shooting, while decedent lay

6  dying.  Defendants, disputing that any "strip search" occurred,

7  assert qualified immunity for the search that did occur.

8  Defendants are entitled to qualified immunity unless their

9  conduct violated plaintiffs' clearly established constitutional

10 rights.  See Johnson, 724 F.3d at 1168.

11     The constitutional right at issue here is decedent's right

12 to be free from unreasonable searches.  Plaintiffs apparently

13 assert that it is clearly established the police may not conduct

14 a "public strip search" of an unconscious (or semi-conscious),

15 mortally wounded arrestee on a parole violation, when the officer

16 had been informed that the decedent kept a gun in his butt-

17 cheeks.

18     However, even assuming that such a search violated

19 decedent's Fourth Amendment rights, that is only the first half

20 of the qualified immunity inquiry.  Plaintiffs still bear the

21 burden of establishing that the unconstitutional nature of the

22 search was "clearly established."  Plaintiffs' opposition brief

23 makes no mention of this, and no attempt to show how such a

24 violation was clearly established.[25]  However, in their own motion

25 ─────────────────────

[25] Its cases do not show it, either.  See Way v. County of

26 Ventura, 445 F.3d 1157, 1163 (9th Cir. 2006) (although the strip
search was unconstitutional, defendants were entitled to

27 qualified immunity because "a reasonable official in the position
of Brooks and Hanson would not have understood that following the

28 jail's policy violated Way's rights because the

1  for summary judgment on this claim, plaintiffs assert that "it

2  was long established that public strip searches of even parolees

3  pursuant to an arrest warrant are unconstitutional absent exigent

4  circumstances and probable cause," citing Foster v. City of

5  Oakland, 621 F. Supp. 2d 779, 791 (N.D. Cal. 2008).

6      The court interprets plaintiffs' argument to be that the

7  Fourth Amendment right alleged to be violated here is clearly

8  established, apparently by Foster.  However, "[a] right is

9  clearly established '[i]f the only reasonable conclusion from

10  binding authority were that the disputed right existed.'"

11  Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1389 (9th Cir. 1997)

12  (emphasis added) (quoting Blueford v. Prunty, 108 F.3d 251, 255

13  (9th Cir. 1997)).  Plaintiffs have not identified the binding

14  authority from which this court could conclude that the search at

15  issue here is a violation of decedent's Fourth Amendment rights.

16  Even if Foster were binding authority, and it is not, it does not

17  establish that the search at issue here was unconstitutional, nor

18  is such a conclusion the only reasonable one to be drawn from

19  Foster.

20      In Foster, the plaintiffs were subjected to far more

21  intrusive searches than was involved here.  The police stopped

22  one plaintiff, purportedly for loitering with intent to sell

23  ────────────────────────────────────────────────────

24  unconstitutionality of the search they conducted was not clearly
   established at the time"), cert. denied, 549 U.S. 1052 (2006);

25  Smith v. City of Oakland, 2011 WL 3360451 at *3 (N.D. Cal. 2011)
   (strip search – which involved pulling the suspects "underwear

26  halfway down" – was not justified during a "parole search" where
   the suspects had not engaged in any unlawful behavior, and were

27  not in violation of parole, but were just driving their gold
   Cadillac around town).

28

narcotics,[26] handcuffed him, searched his testicles by hand,
forced him over the hood of a patrol car, pulled his pants and
underwear down to his knees, spread his buttocks apart and
visually searched his anus, in public.  621 F. Supp. 2d at 783.
The police stopped the second plaintiff, purportedly to search
for contraband,[27] handcuffed him, brought him to the front of a
house, pulled his pants down, ordered him to bend over, spread
his buttocks and conducted a visual search of his anus, in public
and in front of a crowd of people, including some of the
plaintiff's acquaintances.  Id., at 784.  The police pulled the
third plaintiff out of his car, purportedly to search for
contraband,[28] handcuffed him, and after putting him in a patrol
car, pulled down his pants and underwear revealing his genitalia,
and visually searched him for about a minute.  Id., at 784.  In
each case, there is no question that a "strip search" was
involved, as the police pulled the person's pants and underwear
down to their knees, exposing their buttocks and genitalia to
whoever was present.

    Foster found that the following criteria governed such
searches:

    1) there must be exigent circumstances;

    2) the search may only be performed on persons who have been

---

[26] It turned out that this plaintiff was on the tail end of a five
year probation, and had no violations the entire time.  All the
charges were later dropped.  621 F. Supp. 2d at 783.

[27] No charges were ever brought against this plaintiff.  Id., at
784.

[28] No charges were ever brought against this plaintiff.  Id., at
784.

1  lawfully arrested on probable cause and may not be performed on

2  anyone for whom there is no probable cause to arrest;

3      3) the search requires probable cause that is independent of

4  the probable cause found for the arrest; [and]

5      4) the search may only be performed when there is probable

6  cause to believe that the arrestee is in possession of weapons,

7  drugs or dangerous contraband.[29]

8      Even assuming these criteria are binding, or are derived

9  from binding authority, each of them is satisfied here according

10 to the undisputed evidence.  There were plainly exigent

11 circumstances for conducting the search where it was done,

12 namely, the decedent was mortally wounded, and dragging or

13 carrying his body to a more private location would have been an

14 outrage in itself.  Plaintiffs do not contest that decedent was

15 lawfully arrested; he was in violation of his parole, and had

16 "peed dirty."  Plaintiffs do not contest that there was probable

17 cause – independent of the probable cause to arrest – to search

18 decedent's buttocks for a gun that other officers had advised him

19 might be hidden there.

20     Equally important, the search of decedent plainly did not

21 involve exposing his body, or any part of it, to public view, his

22 pants and underwear were not pulled down, and there is no

23 evidence or assertion that anyone other than Moody and the police

24 could witness the search.

25     The court finds that it was not clearly established that the

26

27 [29] A fifth factor involved invasive body cavity searches, which is
   not alleged to have occurred here.

28

search that occurred here violated decedent's Fourth Amendment rights.  Defendants' motion for summary judgment on this portion of Claims 1 and 4 will be granted.

### VI.   SUMMARY JUDGMENT ON THE MERITS

### A.   Claim Two – Due Process – Deprivation of Familial Relations.

All plaintiffs – decedent's parents, his widow and his son – sue Moody for deprivation of their constitutional rights to familial relationships with decedent.  Moody seeks summary judgment on this claim.

### 1.   Constitutional right - familial relationship.

All four plaintiffs – decedent's widow, his parents and his child – have a cognizable liberty interest in their familial relationship with decedent that is protected by the Due Process Clause of the Fourteenth Amendment.  <u>Johnson</u>, 724 F.3d at 1168-69;[30] <u>Curnow ex rel. Curnow v. Ridgecrest Police</u>, 952 F.2d 321, 325 (9th Cir. 1991), <u>cert. denied</u>, 506 U.S. 972 (1992);[31] <u>Ching v. Mayorkas</u>, 725 F.3d 1149, 1157 (9th Cir. 2013).[32] Plaintiffs assert that Moody deprived them of this right when he

---

[30] "The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child." <u>Curnow ex rel. Curnow v. Ridgecrest Police</u>, 952 F.2d 321, 325 (9th Cir. 1991).

[31] "This Circuit has recognized that a child has a constitutionally protected liberty interest under the Fourteenth Amendment in the 'companionship and society' of her father." <u>Hayes</u>, 2013 WL 6224281 at *4 (<u>quoting</u> <u>Curnow</u>, 952 F.2d at 325).

[32] "The right to marry and to enjoy marriage are unquestionably liberty interests protected by the Due Process Clause."  <u>Ching</u>, 725 F.3d at 1157.

1  killed the decedent.  If Moody's conduct, when viewed in the

2  light most favorable to plaintiffs, deprived decedent's family

3  members of their familial interests in a manner that "shocks the

4  conscience," then his conduct "'is cognizable as a violation of

5  due process.'"  Hayes, 2013 WL 6224281 at *4 (quoting Wilkinson

6  v. Torres, 610 F.3d 546, 554 (9th Cir. 2010)[33]).

7          **2.    Whether the shooting "shocks the conscience."**

8          In determining whether Moody's conduct "shocks the

9  conscience," the court must first decide which "standard of

10 culpability" applies.  The two standards that are available from

11 Ninth Circuit jurisprudence are whether Moody acted with

12 (1) "deliberate indifference" to the harm he caused decedent, or

13 (2) a "purpose to harm" decedent.  Porter v. Osborn, 546 F.3d

14 1131, 1136 (9th Cir. 2008), quoting County of Sacramento v.

15 Lewis, 523 U.S. 833, 846 (1998).[34]

16         The appropriate standard of culpability, in turn, depends

17 upon the type of situation that defendant finds himself in at the

18 time of the challenged action.  If Moody found himself in a

19 situation where "actual deliberation is practical," then his

20 "deliberate indifference" to the harm he caused may be sufficient

21 to shock the conscience.  Gantt v. City of Los Angeles, 717 F.3d

22 702, 707-08 (9th Cir. 2013) (quoting Wilkinson, 610 F.3d at 554).

23 On the other hand, if Moody made a "snap judgment" because he

24 found himself in an "escalating" and/or "fast paced" situation

25 _____

[33] Cert. denied, 562 U.S. ___, 131 S. Ct. 1492 (2011).

[34] Defendants unhelpfully ignore this dichotomy, arguing only that
Moody's conduct did not meet the "purpose to harm" test.  ECF
No. 80-1 at 35.

1   "presenting competing public safety obligations," then his

2   conduct will not shock the conscience unless he acted "with a

3   purpose to harm" decedent that was "unrelated to legitimate law

4   enforcement objectives." Id.; Porter, 546 F.3d at 1139 (citing

5   Lewis, 523 U.S. 833).

6       By its nature, the determination of which situation Moody

7   actually found himself in is a question of fact for the jury, so

8   long as there is sufficient evidence to support both standards.

9   Cf., Gantt, 717 F.3d at 708 (trial court could properly have

10  omitted the "purpose to harm" jury instruction where "[n]one of

11  the evidentiary bases for this claim involved 'a snap judgment

12  because of an escalating situation'") (quoting Wilkinson, 610

13  F.3d at 554).  The determination is also a proper matter for

14  summary judgment, so long as the undisputed facts point to one

15  standard or the other.  Indeed, in the Ninth Circuit, there

16  appear to be certain circumstances that require the application

17  of one standard or the other.

18      For example, the fabrication of evidence for use at trial by

19  its nature involves deliberation, and therefore the fact-finder

20  can only apply the "deliberate indifference" standard.  Id.

21  Similarly, "the decision whether to disclose or withhold

22  exculpatory evidence is a situation in which 'actual deliberation

23  is practical,'" thus requiring the application of the "deliberate

24  indifference" standard.  See Tennison v. City and County of San

25  Francisco, 570 F.3d 1078, 1089 (9th Cir. 2009).

26      On the other hand, the "purpose to harm" standard is

27  appropriate for situations involving high-speed car chases,

28  shoot-outs, and armed suspects (with weapons like knives or

automobiles) advancing threateningly on the police, as these situations are rapidly "escalating," requiring the police to make "snap judgments." See, e.g., Hayes v. County of San Diego, Case No. 7-cv-1738-DMS (JMA) (S.D. Cal. March 30, 2009) (Sabraw, D.J.) ("the undisputed evidence show[ed] that Mr. Hayes was holding a knife in a raised position and advancing on Deputy King immediately before the shots were fired"), aff'd, 2013 WL 6224281; Wilkinson, 610 F.3d at 554 ("[w]ithin a matter of seconds, the situation evolved from a car chase to a situation involving an accelerating vehicle in dangerously close proximity to officers on foot"); Porter, 546 F.3d at 1133 ("an urgent situation" was involved where the decedent revved his car engine and moved his car toward the police officers or their patrol car); Moreland v. Las Vegas Metropolitan Police Dept., 159 F.3d 365, 372 (9th Cir. 1998) (police arrived to find a "gunfight in progress" which "threatened the lives of the 50 to 100 people who were trapped in the parking lot," requiring them to "act decisively," as they were "without the luxury of a second chance' to address a life-threatening situation").[35]

In this case, the court finds that the submitted evidence creates a genuine dispute about which standard of culpability

---

[35] The court notes that the Ninth Circuit recently used the "purpose to harm" standard without any discussion of whether it, or the "deliberate indifference" standard, applied to the facts. "Parents have a Fourteenth Amendment right to the companionship of a child, which a police officer violates by 'act[ing] with a purpose to harm' the child 'that [is] unrelated to legitimate law enforcement objectives.' Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008)." Johnson, 724 F.3d at 1168-69. This court does not read Johnson as overruling any prior precedent, and accordingly will analyze both standards of culpability.

1  should apply in this case.  Moreover, if the "deliberate

2  indifference" standard applies, there is a genuine dispute about

3  whether Moody acted with deliberate indifference.  If the

4  "purpose to harm" standard applies, there is a genuine dispute

5  about whether Moody acted with a purpose to harm decedent beyond

6  any legitimate law enforcement objective.

7      When the evidence in this case, including the video, is

8  viewed in the light most favorable to plaintiffs, there is a

9  genuine dispute about whether Moody had the "luxury" of

10  deliberation.  Although the video shows that there was much

11  shouting and movement going on, at no time does the decedent

12  appear to be doing anything other than trying to comply with

13  Moody's shouted orders.  After Moody begins shooting, the video

14  (viewed in the light most favorable to plaintiffs) shows that he

15  was hit and immediately fell to the ground, writhing in pain.

16  Once the decedent fell to the ground, any reasonable jury could

17  find that Moody had the opportunity to deliberate before he

18  resumed shooting.  Moreover, a reasonable jury could find that

19  decedent was unarmed during the entire encounter.  Even if it

20  found that decedent had a knife in his hand, that alone would not

21  necessarily bring the situation into a "purpose to harm"

22  situation, since a reasonable jury could find that decedent was

23  not advancing on Moody, nor threatening him with the knife.

24      However, even if a jury were to find that the situation was

25  rapidly escalating, and that Moody had to make snap judgments, it

26  could still find that Moody acted with an intent to harm the

27  decedent and without any legitimate law enforcement purpose.  The

28  video shows the action from before decedent's truck drives into

1  view, through the pre-shooting, through the shooting, and through

2  the post-shooting activities.  That video, viewed in the light

3  most favorable to plaintiffs, shows Moody shooting an unarmed man

4  struggling to free his leg from a seatbelt strap so that he can

5  get out of a pickup truck, continuing to shoot him as he falls to

6  the ground, and continuing to shoot him after he falls, mortally

7  wounded, to the ground.  It shows that Moody kept shooting long

8  after the decedent could possibly have been a threat to anyone.

9  A reasonable jury could infer from the video that since Moody was

10  shooting decedent as he lay mortally wounded on the ground, there

11  may have been some other, non-law enforcement motivation behind

12  the shooting, namely, a purpose to harm the decedent.

13      Thus, a reasonable jury could find Moody acted with

14  deliberate indifference in a non-emergency situation, or that he

15  acted with a purpose to harm decedent.  Defendants' motion to

16  dismiss Claim 2 will therefore be denied.

17      **B.   Claim Three – <u>Monell</u> Claim Against Bricker and City.**

18      For their Third Claim, Whitney Duenez and D.D. assert a

19  survival claim against Bricker and the City under <u>Monell v. New</u>

20  <u>York City Dept. of Social Services</u>, 436 U.S. 658 (1978), for

21  deprivation of decedent's Fourth Amendment right to be free from

22  unreasonable searches and seizures, and a direct claim for

23  violation of their own Fourteenth Amendment rights to a familial

24  relationship.[36]

_____

25  [36] As discussed above, although D.D. is not alleged to be a

26  successor in interest to the decedent, plaintiffs have now
   submitted a declaration (not challenged by defendants), that D.D.

27  is a co-successor in interest with Whitney Duenez.  <u>See</u> ECF
   No. 66.

28

1    There are two basic routes to municipal <u>Monell</u> liability

2  under Section 1983: (1) the City itself violated plaintiffs'

3  rights, or directed its employees to do so, acting with the

4  required state of mind; or (2) the City is responsible for a

5  constitutional tort committed by its employee.  <u>Gibson v. County</u>

6  <u>of Washoe, Nev.</u>, 290 F.3d 1175, 1185-87 (9th Cir. 2002)

7  (describing "two routes" to municipal liability under

8  Section 1983 for deliberate indifference to inmate's medical

9  needs), <u>cert. denied</u>, 537 U.S. 1106 (2003).[37]

10    In this case, plaintiffs assert that the City is responsible

11  for the constitutional torts committed by Moody.  Under § 1983,

12  the City is responsible only for its own "illegal acts," and

13  cannot be held vicariously liable for the actions of its

14  employees.  <u>Connick v. Thompson</u>, 563 U.S. ___, 131 S. Ct. 1350,

15  1359-60 (2011).[38]  However, plaintiffs can establish liability on

16  the part of the City for Moody's conduct if they can establish

17  that, as a matter of City policy, (1) the City's supervision of

18  Moody was so deficient that it constituted "deliberate

19  indifference" to those people Moody would come into contact with,

20  (2) its training of Moody was similarly deficient, or (3) the

21  City ratified, approved and/or encouraged Moody's

22  unconstitutional conduct.

23        A government entity may not be held liable
          under 42 U.S.C. § 1983, unless a policy,
24        practice, or custom of the entity can be
          shown to be a moving force behind a violation
25

26  [37] <u>Citing</u> <u>Board of County Comm'rs v. Brown</u>, 520 U.S. 397, 404,
    406-07 (1994) and <u>Canton v. Harris</u>, 489 U.S. 378, 387 (1989)).

27
    [38] <u>Citing</u> <u>Monell</u>, 436 U.S. at 692.
28

38

of constitutional rights. <u>Monell v. Dep't of Soc. Servs. of the City of New York</u>, 436 U.S. 658, 694 (1978).  In order to establish liability for governmental entities under <u>Monell</u>, a plaintiff must prove "(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." <u>Plumeau v. Sch. Dist. No. 40, County of Yamhill</u>, 130 F.3d 432, 438 (9th Cir. 1997) (internal quotation marks and citation omitted; alterations in original).

<u>Dougherty v. City of Covina</u>, 654 F.3d 892, 900 (9th Cir. 2011), <u>cert. denied</u>, 569 U.S. ___, 133 S. Ct. 1725 (2013).

Plaintiffs will have the burden of proof on this issue at trial, so they must identify facts in the record that would allow the court to conclude that the City had such a policy or practice.  <u>Board of County Com'rs of Bryan County, Okl. V. Brown</u>, 520 U.S. 397, 404 (1997 ("in <u>Monell</u> and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury").  As for Bricker, he can be held liable under Section 1983 "only for his … own misconduct," he cannot be made to answer for the torts of those under his supervision.  <u>Iqbal</u>, 556 U.S. at 677.

### 1.  Inadequate supervision – Prior shooting incident.

[A] constitutional violation may arise from training or supervision where the training or supervision is sufficiently inadequate as to constitute "deliberate indifference" to the righ[t]s of persons with whom the police come into contact.  <u>City of Canton v. Harris</u>, 489 U.S. 378 (1989).  <u>Canton</u> dealt specifically with inadequate training.  We see no principled reason to apply a different

1    standard to inadequate supervision.

2    <u>Davis v. City of Ellensburg</u>, 869 F.2d 1230, 1235 (9th Cir. 1989).

3    Plaintiffs assert that Bricker and the City (collectively,

4    "Bricker"), knew of repeated acts of misconduct by Moody, but

5    that they were "deliberately indifferent" to the constitutional

6    harms that could result from allowing Moody to continue to do

7    police work armed with his gun.  See Complaint ¶¶ 47 & 51.

8    According to plaintiffs, Bricker knew that Moody had been

9    involved in a prior shooting in which he fired an "excessive"

10   number of bullets into a car tire, yet Bricker allowed a

11   "trigger-happy" Moody to go back to police work with his gun.

12   According to plaintiffs' argument, Bricker "ignored a pattern of

13   Defendant Moody using poor tactical judgment and even poorer

14   trigger control in deliberate indifference to the citizenry they

15   are sworn to protect."  ECF No. 97 at p.16.  Plaintiffs assert

16   that "[t]he evidence reveals" that Moody was involved in a

17   shooting in which he "shot an excessive amount of times" at a

18   tire "that he was near to," and that "[e]yewitnesses" criticized

19   Moody, saying that the shooting was unnecessary and excessive.

20   ECF No. 97.

21   In moving for summary judgment, defendants presented

22   admissible evidence relating to that incident.  According to that

23   evidence, in May 2010, Moody and his partner attempted to arrest

24   a suspect who had driven a stolen car into the parking lot of a

25   motel.  Bricker Decl. at 2.  The driver attempted to flee, and in

26   the process, threatened to run over Moody's partner.  Id.  In

27   response, Moody "shot the tire out of the vehicle to disable it."

28   Id.  Bricker and the police department "evaluated" the incident,

40

1   and concluded that Moody's "use of force in that instance was

2   justified." Id.; DSUF ¶ 6.  This evidence, if undisputed, does

3   not show a lack of proper supervision by Bricker.

4       Plaintiffs have offered no admissible evidence to dispute

5   the account presented by defendants.  Plaintiffs offer, at most,

6   newspaper accounts purporting to report on witness accounts of

7   the incident.  At best, this is hearsay within hearsay, or

8   "double hearsay."  See Mayor of City of Philadelphia v.

9   Educational Equality League, 415 U.S. 605, 618 & n.19 (1974)

10  ("Whether the testimony reflected the newspaper account or a

11  television report, it was nonetheless hearsay," indeed, it was

12  "double hearsay").  What plaintiffs actually offer, however, is

13  the deposition questions that plaintiffs' counsel posed to

14  Bricker about the newspaper accounts of witnesses' purported

15  accounts.  Indeed, plaintiffs' counsel does not even purport to

16  be quoting from the newspaper article, but instead he is merely

17  summarizing what he interprets the article to be saying.

18  Clearly, this is not admissible.

19      Even if the questions about the newspaper accounts of the

20  purported witnesses' statements could somehow be converted into

21  admissible evidence,[39] it does not support their assertion that

22

[39] As inadmissible as this "evidence" is, it is not even

23  accurately recounted by plaintiffs in their opposition.  Nothing
    in the deposition indicates that any purported witness described

24  the shooting as "excessive."  To the contrary, one of the
    supposed witnesses was the motel manager, whose only comment,

25  apparently, was that he was upset that there was a shooting at
    his motel.  The other witness apparently felt that no amount of

26  shooting was justified because, he felt, the suspect could not
    have gotten away.  However, there is no indication that this

27  purported witness knew that the suspect, rather than trying to
    get away, was trying to run down Moody's partner.

28

Bricker ignored a "pattern" of "using poor tactical judgment and even poorer trigger control." See ECF No. 97 at p.16.  One prior shooting does not a "pattern" make.  Moreover, plaintiffs offer no evidence at all that the prior shooting involved an excessive number of shots fired or was otherwise improper.  To the contrary, the only evidence here shows that Moody did not shoot at the driver, he shot at the tire, a plainly restrained response to a car that had already rammed a patrol car and was in the process of trying to run over Moody's partner.  Moreover, the only review of this shooting was conducted by the police department, including Bricker, which concluded that the shooting was proper and justified.

This is the sole basis for plaintiffs' assertion that the City and Bricker are subject to supervisorial liability under Section 1983.  It is plainly insufficient.  See Davis, 869 F.2d at 1235 (reports showed officers were competent to remain on duty, thus evidence fails to show supervisor acted with deliberate indifference in not removing them from duty).

To the degree Claim 3 is predicated upon supervisory liability, defendants are entitled to summary judgment.

### 2.   Inadequate training.

Plaintiffs base their "inadequate training" theory on Moody's performance in firearms tests.  The undisputed evidence, discussed above, shows that on three separate occasions – May 12, 2008, December 7, 2010 and February 9, 2011 – Moody failed on the requalification exam (that is, flunked all three attempts), and

1   then passed the remedial exam.[40]   It appears that despite these

2   repeated failures, followed by passes on remediation, Moody was

3   never required to undergo additional or remedial training on his

4   firearm.[41]

5       Viewing this evidence in the light most favorable to

6   plaintiffs, a reasonable jury could find that the City and

7   Bricker inadequately trained Moody by permitting him to

8   repeatedly keep re-taking his firearm exam until he passed,

9   rather than requiring additional training when he failed.

10      Defendants' motion for summary judgment on Claim 3, to the

11  degree it is predicated upon inadequate training, will be denied.

12                  **3.   Ratification.**

13      Plaintiffs' ratification theory is predicated upon the

14  after-the-fact statements by Bricker that the shooting was

15  justified and was in accordance with police department policy.

16  This theory cannot prevail after Iqbal.   Bricker's conduct must

17  have <u>caused</u> the violation, not merely approved it after the fact.

18  There is no evidence of conduct on Bricker's or the City's part

19  that indicated that they approved of any conduct by Moody or

20  anyone else that could have lead to the excessive force allegedly

21  used here.

22      Defendants are entitled to summary judgment on plaintiffs'

23  _____

24  [40] There is no evidence in the record that Moody ever failed to
    qualify followed by a failure to pass the remedial exam.

25  [41] Defendants do not address the proffered, and apparently
26  undisputed, evidence regarding Moody's repeated failures, instead
    referring only to the February 2011 failure as the only one.   Nor
27  do defendants assert that the cited deposition testimony was
    inaccurate or mistaken in any way.

28

                            43

1    ratification theory of liability.

2        **C.   Claim Six – Cal. Civ. Code § 52.1.**

3        Section 52.1 of the California Civil Code provides a right

4    of action to a person if his exercise or enjoyment of federal or

5    state rights is interfered with by anyone by "threats,

6    intimidation, or coercion."[42]   Defendants seek summary judgment on

7    this claim making exactly the same legal argument they made, and

8    that this court rejected, in their most recent motion to dismiss.

9    See Motion To Dismiss of December 21, 2011 (ECF No. 27) at p. 14

10   (arguing that there is no claim where "'the right [allegedly]

11   interfered with is the right to be free of the force … that was

12   applied'"); Order of February 23, 2012 (ECF No. 35) at pp. 30-32.

13   Defendants have presented no undisputed facts that would change

14   the outcome here, their argument is just a legal one that ignores

15   this court's prior decision, which is the law of the case.

16       This court previously denied defendants' motion to dismiss

17   the Section 52.1 claim, concluding that "[t]he elements of a

18   Section 52.1 excessive force claim are essentially identical to

19   those of a § 1983 excessive force claim."   ECF No. 35 at p.31.

20   Without referencing that conclusion, defendants now argue that

21   "[t]he better reasoned cases hold that section 52.1 claims may

22   not 'merely duplicate [plaintiffs'] section 1983 excessive force

23   claim.'"   ECF No. 80-1 at p.33.   Nor have defendants argued that

24   this court should reconsider its earlier decision.

25       Defendants' motion for summary judgment on this claim will

26

27   [42] Whitney Duenez as successor-in-interest to the decedent, is the
     sole plaintiff for this claim.

28

44

1    be denied.

2        **D.    Claim Seven – Negligence – Wrongful Death.**

3        Plaintiffs' seventh claim alleges liability for negligence

4    in connection with the shooting and the failure to provide

5    medical care to decedent.  Defendants seek partial summary

6    judgment on the failure to provide medical care asserting only

7    "as discussed above, … there was no duty on the officers to

8    perform medical care, and the absence of personally providing

9    medical care after medical care had been summoned did not cause

10   Decedent any damages."

11       The elements of a negligence cause of action are the

12   existence of a legal duty of care, breach of that duty, and

13   proximate cause resulting in injury.  Castellon v. U.S. Bancorp,

14   220 Cal. App. 4th 994, 998 (2nd Dist. 2013).  Plaintiffs will

15   have the burden of proof on each element at trial.  Because

16   plaintiffs have presented no evidence of any kind on proximate

17   cause, defendants are entitled to summary judgment on this claim,

18   without regard to the other elements.

19       At trial, plaintiffs will have the burden of showing that

20   defendants' failure to personally provide medical attention –

21   after summoning medical assistance – caused some injury to the

22   decedent.  Here, defendants have met their summary judgment

23   burden by pointing out the complete lack of evidence that

24   decedent – who Moody had shot thirteen times at close range – was

25   further injured in any way by Moody's subsequent failure to

26   render personal aid beyond immediately summoning medical help.[43]

27   _____

28   [43] "[T]he moving party need only prove that there is an absence of
     evidence to support the non-moving party's case."  Oracle Corp.,

                                    45

1   Plaintiffs have not provided evidence that Moody had the

2   capability of providing personal medical assistance, or that his

3   failure to do so caused any additional injury.  Indeed,

4   plaintiffs do not address the issue.  Plaintiffs argue only that

5   Moody had a duty, under California law, to render aid.  Even if

6   they are correct, with no evidence showing causation, that is not

7   enough to avoid summary judgment.

8       Defendants' motion for summary judgment here will be

9   granted.

10      **E.   Claim Eight – Intentional Infliction of Emotional Distress.[44]**

11

12      Decedent's widow, Whitney Duenez, alleges that Moody

13  intentionally inflicted emotional distress on her, through all

14  the conduct recounted above.

15          The elements of a cause of action for
16          intentional infliction of emotional distress
            are (1) the defendant engages in extreme and
17          outrageous conduct with the intent to cause,
            or with reckless disregard for the
18          probability of causing, emotional distress;
            (2) the plaintiff suffers extreme or severe
19          emotional distress; and (3) the defendant's
            extreme and outrageous conduct was the actual
20          and proximate cause of the plaintiff's
            extreme or severe emotional distress.
21          "[O]utrageous conduct" is conduct that is
            intentional or reckless and so extreme as to
22          exceed all bounds of decency in a civilized
            community.  The defendant's conduct must be
23          directed to the plaintiff, but malicious or
            evil purpose is not essential to liability.

24  <u>Yun Hee So v. Sook Ja Shin</u>, 212 Cal. App. 4th 652, 671 (2nd

25

_____

26  627 F.3d at 387.

27  [44] Defendants do not seek summary judgment on the Fifth Cause of
    Action, for Negligent Infliction of Emotional Distress.
28

1   Dist. 2013) (citations and internal quotation marks omitted).

2        Moody seeks partial summary judgment on the claim to the

3   degree it is predicated upon his failure to personally render

4   medical assistance, pulling decedent's body away from the truck,

5   handcuffing decedent, and searching decedent.[45]

6        Plaintiffs oppose the motion, arguing that shooting the

7   decedent, "dragging" his body, manipulating his body, handcuffing

8   him, searching him, and "standing by" without offering personal

9   medical assistance is outrageous conduct beyond the pale of a

10  civilized society.  ECF No. 97 at 30.

11       Plaintiffs however, have already conceded that moving

12  decedent's body away from the truck, and handcuffing him were

13  entirely reasonable and proper.  Plaintiffs' Response to DSUF

14  ¶¶ 16 & 17.  As for the body manipulation and search, plaintiffs

15  offer no evidence that Whitney Duenez saw, heard or was otherwise

16  aware of any of these activities.  Accordingly, she has failed to

17  show that any of these activities was directed toward her.  <u>See</u>

18  <u>Christensen v. Superior Court</u>, 54 Cal.3d 868, 905 (1991) ("[t]he

19  law limits claims of intentional infliction of emotional distress

20  to egregious conduct <u>toward plaintiff</u> proximately caused by

21  defendant").

22       As for the failure to personally render aid, plaintiff fails

23  to proffer any evidence at all that Moody had the ability to

24  render aid beyond what he did, namely, calling immediately for

25  medical assistance.  Nor does she proffer any evidence that his

26

27  [45] Moody does not seek partial summary judgment to the degree this
    claim is predicated upon the shooting of decedent.

28

failure to render aid was directed at her, as opposed to being
the natural consequence of his inability to render aid.  Neither
side argues the point, but it does not seem possible that a
person can <u>intentionally</u> inflict emotional distress by failing to
take action that he is not capable of taking.[46]

The defendants' motion for partial summary judgment on
Claimn 8 will be granted as to all of Moody's actions except for
the shooting itself.

### F.   Relief – Injunctive Relief.

Defendants seeks partial summary judgment on the claim for
injunctive relief based solely upon their argument that they are
entitled to summary judgment on both the <u>Monell</u> claim and the
Section 52.1 state claim.  As discussed above, they are not
entitled to summary judgment on the Section 52.1 claim.

Accordingly, defendants' motion for partial summary judgment
on this issue will be denied.

### G.   Punitive Damages.

Defendants Moody and Bricker seek summary judgment on the
request for punitive damages, essentially because Moody's conduct
was not "malicious, oppressive, or in reckless disregard of
Plaintiff's rights."  Viewed in the light most favorable to
plaintiffs, Moody's conduct meets the standard for punitive
damages.

Defendants' motion for summary judgment on the request for
punitive damages will be denied.

---

[46] Nor does plaintiff proffer evidence that Moody had a duty to
equip himself with the ability to render aid under the
circumstances presented.

48

1    **V.   ANALYSIS – PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

2        Plaintiffs move for summary judgment.  The motion is based

3    entirely on plaintiffs' view of what the video shows.

> As to whether the deputies violated the
> Fourth Amendment, two Supreme Court decisions
> chart the general terrain. Graham v. Connor,
> 490 U.S. 386 (1989), defines the excessive
> force inquiry, while Tennessee v. Garner, 471
> U.S. 1 (1985), offers some guidance tailored
> to the application of deadly force.
>
> "Graham sets out a non-exhaustive list of
> factors for evaluating [on-the-scene]
> reasonableness: (1) the severity of the crime
> at issue, (2) whether the suspect posed an
> immediate threat to the safety of the
> officers or others, and (3) whether the
> suspect actively resisted arrest or attempted
> to escape." In Garner, the Supreme Court
> considered (1) the immediacy of the threat,
> (2) whether force was necessary to safeguard
> officers or the public, and (3) whether
> officers administered a warning, assuming it
> was practicable. See Scott v. Harris, 550
> U.S. 372, 381–82 (2007). Yet, "there are no
> per se rules in the Fourth Amendment
> excessive force context." Mattos v. Agarano,
> 661 F.3d 433, 441 (9th Cir. 2011) (en banc)
> [cert. denied, 566 U.S. ___, 132 S. Ct. 2681
> (2012)].

18   George v. Morris, 736 F.3d 829,837-38 (9th Cir. 2013) (citation

19   omitted).

20       Plaintiffs are correct that the court is now required to

21   consider their motion (and defendants') "in the light depicted by

22   the videotape." Scott, 550 U.S. at 381.  However, the court must

23   view the video in the light most favorable to the non-moving

24   party, if there is a genuine dispute about what is depicted.

25   Id., 550 U.S. at 380 ("[a]t the summary judgment stage, facts

26   must be viewed in the light most favorable to the nonmoving party

27   only if there is a "genuine" dispute as to those facts").

28       Viewing the video in the light most favorable to Moody (and

49

in the light that will be presented by his attorney to the jury at trial), Moody was shooting at a man who exited the truck with something in his right hand.  That "something" could have been a knife and was reasonably believed by Moody to be a knife (and in fact, an empty knife holder was found clipped to decedent's belt, and a knife was later found in the bed of the pickup truck, possibly thrown by decedent during the chaos of the shooting).  Before the decedent exited the truck, Moody was shouting at him not to move (which presumably meant, stay in the truck).  The decedent disobeyed the order (assuming he heard it), and attempts to exit the truck.

Just before the shooting, and as decedent just starts to exit the truck, Moody actually returns his gun to its holster.  However, upon trying to exit, the decedent makes a sudden jerking move, which seems to prompt Moody to grab his gun again, demand that decedent "drop the knife," and start shooting.  The jerking motion was, no doubt, decedent first getting his leg caught in the seat belt and losing his balance, but, viewed in the light most favorable to Moody, he had no way of knowing this.  Indeed, when Moody attempts to pull decedent's body away from the car, he is unable to, apparently because he was still unaware that decedent's leg was caught in the seatbelt.

During the shooting, decedent's body continually moved in an erratic manner, occasionally turning away from Moody, such that Moody could have believed that the decedent was reaching for the knife or another weapon.[47]  The shooting continued until the

---

[47] Indeed, Moody's repeated failure on his firearms exams could well have contributed to his apparent doubt that he had really

1   decedent was completely still, but Moody did not empty his gun

2   into decedent (Moody had two bullets left).

3       The court finds that there is a genuine dispute about

4   exactly what the video depicts.  Defendants say it depicts

5   decedent with a knife, plaintiffs say it depicts decedent with a

6   tweezers.  The video is not fine enough to resolve that dispute.[48]

7   Defendants say decedent kept reaching as if for a weapon,

8   plaintiffs say decedent's body was simply responding to being

9   shot.  The video does not resolve that dispute.  Those are among

10  the main facts that must be resolved to determine whether the

11  shooting was a justified response to a dangerous parolee trying

12  to throw a knife at a police officer, or the unjustified police

13  killing of an unarmed man just trying to get out of a pickup

14  truck.

15      Plaintiffs' motion for summary judgment on claims predicated

16  on the shooting will be denied in its entirety.  The remainder of

17  plaintiffs' motion for summary judgment asks the court to view

18  the evidence in the light most favorable to them, the moving

19  parties.  That being improper, the court will deny the remainder

20  of plaintiffs' motion for summary judgment.

21      **VI.   ANALYSIS – PLAINTIFFS' MOTION TO SEAL DOCUMENTS.**

22      Plaintiffs ask the court to seal certain documents, ECF Nos.

23  _____

24  shot and disabled decedent, leading him to believe that the
    twitching body was still a threat, rather than an already-

25  disabled person whose body was simply responding to each
    additional bullet it was hit with.

26

27  [48] Nor does the court have the ability to slow the motion down,
    even assuming that such a viewing would be fair, considering that
    Moody experienced the incident in real time, not slow motion.

28

82 and 99, pursuant to the stipulated Protective Order entered in this case (ECF No. 45).  Defendants, who would appear to be the ones with an interest in keeping the documents confidential, have neither requested that the documents be sealed nor opposed plaintiffs' request.[49]

> The public has a "general right to inspect and copy public records and documents, including judicial records and documents."

Estate of Migliaccio v. Allianz Life Ins. Co., 686 F.3d 1115, 1119 (9th Cir. 2012), quoting Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978).  "This right extends to pretrial documents filed in civil cases."  Id., citing San Jose Mercury News, Inc. v. U.S. Dist. Court, 187 F.3d 1096, 1102 (9th Cir. 1999).  Although the right is not absolute, the court must "'start with a strong presumption in favor of access to court records.'"  Id., quoting Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1129 (9th Cir. 2003).

    Plaintiffs, as the party requesting to seal court records, bear the burden of "providing 'sufficiently compelling reasons' that override the public policies favoring disclosure."  Id.  In ruling on the motion, this court must "balance the competing

---

[49] The Protective Order contemplates that defendants, not plaintiffs, would move to seal these documents, as they are marked confidential at the behest of defendants.  ECF No. 45 ¶ 10 ("If plaintiffs wish to file with the Court any documents marked Confidential Material, plaintiffs shall notify defendants a reasonable period before hand to afford defendants an opportunity to seek to have the document sealed under Local Rule 141").  The parties have offered no explanation for why they have proceeded by relying on plaintiffs to make this motion.

interests of the public and the party seeking to seal judicial records." <u>Id.</u>, quoting <u>Kamakana v. City & Cnty. of Honolulu</u>, 447 F.3d 1172, 1176 (9th Cir. 2006).  If the court seals the records, it must "articulate a factual basis for each compelling reason to seal." <u>Id.</u>

Plaintiffs do not even attempt to meet their burden here. Nor do they assert that any exception to the presumption of public access applies here.[50]  They do not explain, even in a general way, why the information is confidential – other than to say, it is stamped "confidential."[51]  Moreover, the court cannot even infer a reason from the Protective Order, because that Order does not explain what types of materials are subject to it; materials are confidential simply because a party stamps them with a "Confidential" stamp.

The request to seal will be denied.

**VII. ANALYSIS – PLAINTIFFS' MOTION TO RE-OPEN DISCOVERY.**

Plaintiffs ask to re-open discovery so that they can depose opposing counsel.  Plaintiffs assert that one witness's testimony changed between the time he was interviewed by the police investigators soon after the shooting, and the time he testified years later at deposition.  They also assert that the witness –

---

[50] For example, the presumption does not apply to "judicial records 'filed under seal when attached to a <u>non-dispositive</u> motion,'" or put another way, the presumption is rebutted in that circumstance. <u>Midland</u>, 686 F.3d at 1119, quoting <u>Foltz</u>, 331 F.3d at 1136 and <u>citing</u> <u>Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.</u>, 307 F.3d 1206, 1210 (9th Cir. 2002).

[51] For example, sealing documents might be appropriate if they disclose the name of decedent's son, certain employment information, or private medical information.

Michael Henry – was provided a "manipulated" transcript of his interview statement just before the deposition.  It was manipulated because it contained bolding and underlining that was not included in the version of the interview transcript produced to plaintiffs.

Plaintiffs have not shown that the difference in testimony is material in any way.  Nor have they demonstrated why they need to depose opposing counsel – rather than Henry – to find out why there was a change in his story.

In any event, the change in Henry's story is not material, and thus cannot support such an extraordinary remedy.  At his initial interview, Henry states that after decedent dropped his knife, decedent himself picked it up and placed it in decedent's tool bag before decedent headed to Flores Court in the pickup truck.  At his deposition, Henry states that after decedent dropped his knife, <u>Henry</u> picked it up and handed it to decedent before decedent headed to Flores Court in the pickup truck. Plaintiffs do not explain why the difference in the story matters.  It appears that the material point of Henry's testimony is not who picked a knife up off the ground, but rather that decedent had a knife, and that he took it with him to Flores Court.  The relevance of how it wound up in decedent's hands is not explained and it is not obvious to the court.

Plaintiffs' motion to re-open discovery will be denied.

### VIII. SUMMARY

For the reasons stated above, the court orders as follows:

1.   Defendants are entitled to the following partial adjudication, based upon plaintiffs' concessions, specifically,

54

that no claim in this action arises from defendants' pointing a gun at decedent's widow, pulling decedent away from the pickup truck, handcuffing decedent, searching the house on Flores Court or detaining or arresting any non-parties to this action. Accordingly, the portions of any claim that are predicated upon that conduct are hereby **DISMISSED WITH PREJUDICE**;

2.   Defendants are entitled to qualified immunity for the search that was performed on decedent after the shooting. Accordingly, the portions of any claims that is predicated upon that conduct are hereby **DISMISSED WITH PREJUDICE;**

3.   Defendants' motion for summary judgment on Claim 1, to the degree it asserts any state claim, is hereby **DISMISSED WITH PREJUDICE**;

4.   Defendants' motion for summary judgment against Whitney Duenez on Claim 1 is **GRANTED**;

5.   Defendants' motion for summary judgment against D.D. (as successor in interest to decedent's estate) on Claim 1, is **DENIED** to the degree it is predicated upon the Fourth Amendment, and **GRANTED** to the degree it is predicated upon the alleged denial of medical care;

6.   Defendants' motion for summary judgment on Claim 2, relating to the claim for deprivation of familial relationships is **DENIED**;

7.   Defendants' motion for summary judgment on Claim 3, for Monell liability against the City and Bricker, is hereby **DENIED**, and that claim may proceed to the degree it is predicated upon inadequate training only;

8.   Defendants' motion for summary judgment on Claim 4 is

1    **DENIED**, however, the court <u>sua sponte</u> dismisses Claim 4 to the

2    degree it is predicated upon the deprivation of familial

3    association, brought by Whitney Duenez in her capacity as

4    successor in interest to the decedent's estate;

5         9.   Defendants' motion for summary judgment on Claim 6, a

6    claim under Cal. Civ. Code § 52.1, is hereby **DENIED**;

7         10.   Defendants' motion for summary judgment on Claim 8, by

8    Whitney Duenez for intentional infliction of emotional distress,

9    is **GRANTED**;

10         11.   Defendants' motion for summary judgment on all claims

11    for injunctive relief is **DENIED**;

12         12.   Defendants' motion for summary judgment on the request

13    for punitive damages is **DENIED**;

14         13.   Plaintiffs' motion for summary judgment is **DENIED** in

15    its entirety;

16         14.   Plaintiffs' motion to seal documents is **DENIED**;

17         15.   Plaintiffs' motion to re-open discovery, so that they

18    can depose defendants' attorney, is **DENIED**.

19         IT IS SO ORDERED.

20         DATED:  December 20, 2013.

21

22

23

                         LAWRENCE K. KARLTON
24                          SENIOR JUDGE

25                          UNITED STATES DISTRICT COURT

26

27

28